**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED AIRLINES, INC., a Delaware corporation, | ) | |
| ORBITZ WORLDWIDE, LLC, a limited liability company, | ) | |
| ORBITZ, LLC, a limited liability company, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| v. | ) | |
| | ) | Jury Trial Demanded |
| AKTARER ZAMAN, individually and d/b/a SKIPLAGGED.COM. | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs United Airlines, Inc. ("**United**"), Orbitz Worldwide, LLC ("**Orbitz Worldwide**"), and Orbitz, LLC ("**Orbitz, LLC**")[1] (collectively, "**Plaintiffs**"), by and through their undersigned counsel, for their Complaint against Defendant Aktarer Zaman ("**Zaman**"), individually and d/b/a Skiplagged.com ("**Skiplagged**"), state as follows:

## NATURE OF THE ACTION

1.      This is a federal-question and diversity action involving statutory claims under the Lanham Act, 15 U.S.C. § 1125, and common law claims under Illinois law.  Plaintiffs assert claims against Zaman for federal unfair competition, tortious interference with contract, breach of contract, and common law misappropriation.

2.      Defendant Zaman, operator of Skiplagged, has used his website to intentionally and maliciously interfere with Plaintiffs' contracts and business relations in the airline industry, and in doing so, has falsely associated Skiplagged with Orbitz and United.  By promoting

---

[1] Orbitz Worldwide and Orbitz, LLC will be collectively referred to as "**Orbitz**," unless otherwise indicated.

prohibited forms of travel on Skiplagged, Zaman has induced breach of Orbitz Worldwide's travel agency contracts with commercial airlines and of United's customer contractual relationships.

3.      Skiplagged promotes and makes available to consumers an airline booking ploy called "hidden city" ticketing.  "Hidden city" ticketing refers to a travel arrangement where the passenger's intended final destination is not the final arrival city on his or her itinerary, but rather an intermediate or connecting city.

4.      With intent to interfere with and cause breach of Plaintiffs' contracts and to otherwise interfere with United's ticketing processes, Skiplagged prompts consumers to book tickets from their departure city to a city to which those consumers do not intend to travel.  Upon arrival at an intermediate or connecting city on the itinerary, the passengers leave the airport and "skip" the last leg(s) of their itineraries.  In its simplest form, a passenger purchases a ticket from City A to City B to City C, but does not travel beyond City B.

5.      As explained further below, "hidden city" ticketing is strictly prohibited by most commercial airlines because of logistical and public safety concerns.  When consumers purchase a flight through United, they agree to be bound by United's prohibition against "hidden city" ticketing.  Also, as further protection against this prohibited form of travel, airlines often require online travel agencies, such as Orbitz, to prohibit "hidden city" ticketing and other abusive ticketing practices.

6.      With full knowledge of these prohibitions, Zaman has provided and continues to provide a search tool that enables consumers to locate "hidden city" flights on Skiplagged and then purchase tickets for those flights through Orbitz's website (www.orbitz.com) and United's website (www.united.com).  Neither Orbitz nor United has granted Zaman permission to engage

in this prohibited form of booking or to otherwise offer their services. To the contrary, Zaman expressly agreed not to engage in this conduct when he entered into an affiliate agreement with Orbitz, LLC in early 2013. Orbitz, LLC has since terminated that agreement. More recently, Zaman agreed to stop engaging in this prohibited form of booking, only to continue the conduct unabated. At the same time, Zaman has taken steps to try to hide from Orbitz and United his continued bad conduct and breach of his promises to stop.

7.      Moreover, the process that Zaman uses to promote "hidden city" ticketing and prompt purchases of "hidden city" tickets constitutes a deliberate attack on Plaintiffs' trademark rights. Despite his promise to Orbitz that he would cease and desist his redirection of users to the Orbitz website, Zaman continues to assist Skiplagged users in booking "hidden city" flights through Orbitz and to otherwise continue to link Skiplagged consumers to the Orbitz website. Additionally, despite his assurances to United that he would remove all United content from Skiplagged, Zaman continues to include United content and flights on Skiplagged and continues to link Skiplagged consumers to the United website. These deliberately false associations that Zaman has created between Skiplagged and Plaintiffs threaten to confuse consumers, deceive the public, and damage Plaintiffs' businesses.

**THE PARTIES**

8.      Plaintiff United is a Delaware corporation, with its principal place of business at 233 S. Wacker Dr., in Chicago, Illinois.

9.      Plaintiff Orbitz Worldwide is a Delaware limited liability company, with its principal place of business at 500 W Madison St. in Chicago, Illinois. Orbitz Worldwide's sole member is Orbitz Worldwide, Inc., a publicly held Delaware corporation, with its principal place of business in Chicago, Illinois.

3

10.     Plaintiff Orbitz, LLC is a Delaware limited liability company, with its principal place of business at 500 W Madison St. in Chicago, Illinois.  The two members of Orbitz, LLC are Orbitz, Inc. and O Holdings, Inc.  Orbitz, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.  O Holdings, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

11.     Defendant Zaman, an individual, is the founder and CEO of Skiplagged.  Upon information and belief, Zaman is a resident of Ozone Park, New York, and Skiplagged's principal place of business is at 8312 101st Ave., Fl. 3, in Ozone Park, New York 11416. Despite publishing its own "Terms of Use" on its website and referring to itself as a "business" in same, on neither the Skiplagged website, nor Zaman's personal correspondence with Plaintiffs, does Zaman indicate any corporate status for Skiplagged.  Furthermore, Plaintiffs are unable to identify any registered corporate status for Skiplagged.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.  The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims that arise under the laws of the United States, namely, the Lanham Act, 15 U.S.C. § 1125.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal-question claims that they form part of the same case or controversy.

13.     The Court also has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiffs and Zaman are citizens of different States and more than $75,000 is in controversy.  Zaman's acts interfere with and jeopardize Orbitz Worldwide's travel agency agreements with major airlines, from which Orbitz Worldwide earns well in excess of

$75,000 in revenue annually.  By definition, "hidden city" ticketing interferes with United's ability to sell unused seats on the final leg(s) of connecting flights, resulting in the loss of revenue that United would have earned by selling the unused seats.  In certain instances, "hidden city" ticketing could result in flights with empty seats being listed as full flights, potentially causing the diversion of hundreds, if not thousands, of prospective United customers to other airlines, in some cases permanently.  Finally, Plaintiffs have invested millions of dollars to raise their brand awareness and develop goodwill with their customers and industry partners – goodwill that is unalterably harmed through any false association Zaman implies between him and Orbitz and United.  Thus, any modicum of success by Zaman will have an impact on Plaintiffs far in excess of $75,000.

14.    The Court has specific personal jurisdiction over Zaman because he has sufficient contacts with the State of Illinois, and has committed tortious acts directed to Illinois.  Among other things, Zaman has intentionally interfered with Illinois contracts performed (or which are still in the process of being performed) in Illinois, and has intentionally interfered with the contractual duties of Illinois residents.  In particular, Zaman has interfered with Orbitz Worldwide's agency agreements with commercial airlines and has induced Orbitz's and United's customers to breach the airlines' contracts of carriage.  Additionally, Zaman's acts are likely to cause confusion among Illinois consumers who purchase airline tickets on Orbitz's website.  Those purchases are processed on Orbitz's servers located in Illinois.  The damage that Orbitz and United will suffer from these tortious acts will be predominantly felt in Illinois.  Furthermore, Zaman made promises to Orbitz and United, directed to Illinois, that he would stop his improper conduct, only to break those promises almost immediately, while making efforts to conceal his deception to Orbitz and United employees in Illinois.

15.     The Court also has specific personal jurisdiction over Zaman because he has expressly consented to the exclusive jurisdiction of the federal courts in Illinois.  On December 29, 2013, Zaman entered into an agreement with Orbitz, LLC to become a member of Orbitz, LLC's affiliate program (the **Affiliate Agreement**").  Under the "Miscellaneous" provisions of the Affiliate Agreement, Zaman consented to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois for any dispute involving the Affiliate Agreement.  (*See* Affiliate Agreement, a copy of which is attached hereto as Ex. A ("Miscellaneous").)  Zaman also agreed that the Affiliate Agreement would be governed by Illinois law.  (*Id.*)  Orbitz, LLC terminated Zaman's affiliate status on September 3, 2014.  The Affiliate Agreement had obligations and covenants that survived termination.  Orbitz, LLC's breach of contract claim arises out of the Affiliate Agreement.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to Plaintiffs' claims occurred in Chicago, Illinois, which is within this judicial district.  Moreover, as explained above, Zaman agreed to venue in this Court.  (*See id.*)

## FACTS COMMON TO ALL COUNTS

### I.     Orbitz's Business and Its Affiliate Program

17.     Orbitz is a leading global online travel company offering a broad range of travel products and services, including airline tickets, hotels, car rentals, cruises, and vacation packages.

18.     Orbitz's success in the marketplace is dependent, in part, on long-standing working relationships with commercial airline companies.  To this end, Orbitz must ensure that its bookings comply with its partnering airlines' rules and restrictions.

19.     By way of example, American Airlines Inc.'s rules and regulations prohibit "hidden city" ticketing, among other abusive ticketing practices.  In Section 3(c) of American Airlines' governing addendum with its travel agents – which applies to flights booked on American Airlines, US Airways, Envoy Air, and PSA Airlines, among other airlines – American Airlines requires its travel agents to acknowledge that "hidden city" ticketing and other prohibited forms of travel violate American Airlines' rules.  (*See* American Airlines, Inc. Addendum to the Governing Travel Agency Agreement (the "**American Agency Addendum**"), a copy of which is attached hereto as Ex. B.)  Likewise, according to Section 3(c) of the American Agency Addendum, travel agents must ensure that bookings done through the agent are not for "hidden city" tickets or other prohibited forms of travel.  (*Id.*)

20.     A number of other airlines have similar arrangements with their travel agents.  For instance, in Section 3(c) of their governing addenda with travel agents, British Airways and Iberia Airlines require agents to ensure that bookings made through the agents are only for customers' genuine travel requirements.  (*See* British Airways PLC Travel Agency Addendum, a copy of which is attached hereto as Ex. C; Iberia Lineas Aereas De España, S.A. Operadora, Sociedad Unipersonal Travel Agency Addendum, a copy of which is attached hereto as Ex. D.) Additionally, travel agents may not encourage customers to circumvent or violate these airlines' general conditions of carriage.  (*See* Ex. C; Ex. D.)  Delta Airlines' rules and restrictions impose similar obligations on travel agents.

21.     Within this contractual framework set by the airlines, Orbitz strives to increase traffic on Orbitz.com and enhance awareness of the Orbitz brand.  One way in which Orbitz does this is through the Orbitz affiliate program.  This program permits authorized "affiliates" to establish HTML links between third-party websites and Orbitz.com, and then earn commissions

on travel products ultimately purchased through Orbitz. Orbitz also authorizes a small number of companies to "deep link" into the Orbitz.com website. Deep-linking refers to hyper-linking to an interior web page on the Orbitz.com website, such as that generated by a specific flight search.

22.     As explained above, Zaman signed an Orbitz Affiliate Agreement on December 29, 2013 (which Orbitz, LLC terminated on September 3, 2014). (*See* Ex. A.) In the Affiliate Agreement, Zaman agreed that he would not, "[d]uring the term of or after the expiration or termination of this Agreement, use any mark, name or domain name of any type which is confusingly similar to 'Orbitz' or other 'Orbitz' trademarks." (*See id.* ("*Do Not Use Our Trademark.*")) In addition, Zaman expressly agreed to abide by all of the terms and conditions on Orbitz's websites, including the Orbitz.com Terms and Conditions (the "**Terms and Conditions**") relating to prohibited forms of travel and use of Orbitz's trademarks. (*Id.* ("*Link to the Orbitz Site.*"))

23.     In pertinent part, Section 3 of the Orbitz.com Terms and Conditions prohibits authorized affiliates – absent prior written consent from Orbitz, LLC – from implying that Orbitz is endorsing the affiliates' products and services; from using Orbitz's website for illegitimate reservations and bookings; from using software to interfere, or attempt to interfere, with the normal operation of Orbitz's website; and from disguising the origin of information transmitted through Orbitz's website. (*See* Terms and Conditions, a copy of which is attached hereto as Ex. E.) Zaman's acts of promoting "hidden city" ticketing and redirecting users to Orbitz.com violate these provisions. Orbitz, LLC terminated Zaman's affiliate status on September 3, 2014, shortly after learning of Skiplagged's promotion of "hidden city" ticketing.

## II.     United's Business and Prohibition of "Hidden City" Ticketing

24.     United is one of the world's largest commercial airlines, operating (along with United Express) an average of 5,100 flights a day to more than 370 airports across six continents.

25.     As part of its global operations, United must comply with numerous air traffic and public safety regulations, such as those established by the Federal Aviation Administration and the Transportation Security Administration.  Moreover, to stay competitive in the marketplace, United must also operate its fleet with its passengers' schedules and demands in mind.  To help fulfill these twin goals, United includes specific provisions in its passengers' contracts that are designed to ensure predictable flight schedules and passenger headcounts.

26.     Specifically, in its standard contract of carriage, United prohibits its customers from engaging in "Hidden city" ticketing (also known as "Point Beyond Ticketing").  (*See* United Airlines, Inc. Contract of Carriage, a copy of which is attached hereto as Ex. F ("Section 6(J)").)

27.     Passengers who violate this provision adversely affect United's ability to estimate headcounts, which can not only cause disruptions at the airport gate, but can also require mechanical tweaks, such as variations in the amount of jet fuel needed for each flight.  Moreover, because United sometimes holds flights at gates when passengers have not yet arrived, "hidden city" ticketing could cause flight delays on connecting flights where one or more "hidden city" passengers fail to appear.  Delays on one leg of a flight can impact subsequent legs of a flight, or subsequent flights flown by the same airplane, with the potential for considerable disruption of United's flight schedule and harm to United's other customers.  As the use of "hidden city" ticketing increases, the issues could become exponentially larger.

28.     "Hidden city" ticketing also causes irreparable harm to United's relationships with prospective customers.   Any time a passenger foregoes a leg of travel, the passenger essentially takes away a seat that could have been sold to a prospective United customer.   The prospective United customer may switch to another airline as a result, especially if his or her desired flight is full.   In such case, United likely would also lose ancillary sales for other services, such as car rentals and lodging, and a number of disappointed customers may switch from United for all future travel if United's flights are consistently "full."   United has no adequate remedy at law.

29.     United also expends significant time, labor, and financial resources on developing its fare calculations and flight schedules.   Likewise, United expends significant resources every year on protecting its fare and scheduling data from its competitors so that it cannot be easily duplicated without United's prior consent.   The unauthorized use of this content by United's competitors not only disadvantages United in the marketplace, but also discourages future investments in new fare and scheduling models.

## III.    Skiplagged's Promotion of "Hidden City" Ticketing

30.     With knowledge of Plaintiffs' prohibitions of "hidden city" ticketing, Zaman has intentionally and maliciously used Skiplagged to damage Plaintiffs' businesses.   Starting in December 2013, and perhaps earlier, Zaman began offering consumers a customized search tool that locates "hidden city" flights and makes them available for booking by providing links to external booking websites.   At times, Zaman has provided links to Orbitz only, while on other occasions, Zaman has also provided links to airline websites, such as United's, and other third-party booking websites.   Based on Plaintiffs' investigation to date, Zaman's search-and-redirection scheme relies on a combination of new and old technologies.

31.    As the foundation for his scheme, Zaman has developed a graph database that pulls real-time flight and fare data from an external source and then processes it through a customized computer program that locates "hidden city" flights.  Zaman's customized program exploits certain data, such as flight numbers, to determine which flights present "hidden city" ticketing opportunities.

32.    When a Skiplagged user searches for a specific flight itinerary, Zaman's graph database will display an extensive list of flight results, including any "hidden city" flights. Skiplagged identifies the airline(s) that will be used for each flight, both by logo and by name, and lists the flight time.  The user then has the ability to choose a preferred flight and click "Book Now."

33.    In recent months, Skiplagged has employed a variety of redirection strategies. Under one of Skiplagged's configurations, the user is always redirected to a search result on the Orbitz website.  Under another one of Skiplagged's configurations, the user is redirected to either Orbitz's website, to an airline's website, such as United's, or to another third-party booking website.  With respect to Skiplagged's redirection to Orbitz, Zaman's redirection scheme involves several unique features.

34.    First, Zaman has developed an algorithm that can discern the precise tolerance of search parameters on Orbitz's website, such as desired departure time.  This algorithm enables Zaman to generate a specific search on Orbitz that will produce only one flight result.  With "hidden city" flights, that algorithm also utilizes a destination city to which a Skiplagged user does not intend to travel.

35.    Second, Zaman's program identifies the unique Orbitz URL needed to generate the Skiplagged user's desired search result.  In furtherance of his scheme to generate precise

search results, Zaman likely wrongfully obtained information about Orbitz's application programming interface ("**API**") at some point before September 2014. Orbitz's API information is necessary to "call in" to Orbitz's website with the unique Orbitz URL.

36. Third, with the help of a redirector service, Skiplagged redirects users to the unique Orbitz URL when they select "Book Now." This redirection process is accomplished through the use of an antiquated html technique called "meta refresh." In its most basic form, a "meta refresh" will automatically refresh the user's current web page after a specified time interval. With a few tweaks of the html code, "meta refresh" can also be used to automatically transfer users to a new page on a different website. This is done by instructing the browser to fetch a different URL and setting a low refresh time interval. Here, Skiplagged instructs the user's browser to refresh automatically to the unique Orbitz URL that Skiplagged's program has identified.

37. When Zaman causes the redirect to Orbitz, he also causes the user's computer to initiate a pre-populated search utilizing his algorithm to cause searching on Orbitz's site that would not be replicable by the typical user or otherwise through authorized use of the site. Once on the Orbitz website, because of the Zaman search (conducted without the user's knowledge) the user is presented with the exact flight itinerary that was selected on Skiplagged. This is akin to "deep linking," which transfers a user to a specific, indexed piece of web content on another website, rather than the website homepage. Just as with "deep linking," Zaman uses the "meta refresh" and related algorithm to seamlessly transfer a user from Skiplagged to Orbitz's site, which creates the impression that Skiplagged and Orbitz are partners or one-in-the-same.

38. To counteract Zaman's conduct, Orbitz is continuing to investigate ways in which it may detect customers originating on Skiplagged and prevent the "hidden city" bookings from

being made on the Orbitz site. Nevertheless, Zaman's repeated variation in redirection strategies and his use of technical approaches like the "meta refresh" technique have frustrated Orbitz's efforts. Injunctive relief will be necessary to ensure that Zaman does not further alter his software in an effort to circumvent Orbitz's corrective actions.

39. Skiplagged offers both desktop and mobile app versions of its search tool, both of which have redirected to the Orbitz.com and United.com websites.

40. To offer a more concrete example, suppose a Skiplagged user wishes to purchase a flight from Chicago to Los Angeles as part of a "hidden city" itinerary. The user can begin by inserting the desired cities or airports into Skiplagged's search boxes, such as ORD (O'Hare International, Chicago) to LAX (Los Angeles International). Skiplagged automatically populates a list of results.



(*See* larger copy, which is attached hereto as Ex. G.)

41.     In this example, the first option is a "hidden city" flight on American Airlines that departs from Chicago, connects through Los Angeles, and then continues on to Calgary, Alberta (YYC, Calgary International).  The user is shown the American Airlines logo for each leg of the flight.

42.     After choosing a departing and returning flight, the user is shown a Chicago-to-Los Angeles itinerary, which includes an additional leg of Los Angeles to Calgary.  Skiplagged invites the user to "Book Now!" on the itinerary screen.



(For a larger copy, *see id.*)

43.     In this example, after clicking the "Book Now!" selection, the user is redirected to Orbitz's website and presented with the exact same itinerary as was shown on Skiplagged.



(For a larger copy, *see id.*)

44.     To the average internet user of Skiplagged, the transition from the Skiplagged site to Orbitz's website is seamless and strongly suggests an affiliation or identity between Skiplagged and Orbitz that does not exist.  Indeed, online travel agencies such as Orbitz enter into agreements with airlines to use and publish the airlines' data, all with the prior consent and cooperation of the airlines and according to financial terms that compensate all parties involved. By creating a website that operates in much the same manner as an online travel agency, and by linking that site to Orbitz's site, Zaman is attempting to confuse and mislead the public into believing that his website, and the "hidden city" ticketing it employs, is done with the approval (if not the outright authorization and sponsorship) of Orbitz and the airlines.

45.     Under the Skiplagged configuration that redirects some users directly to airlines' websites, Zaman has caused a similarly false association between Skiplagged and United.  For example, suppose a Skiplagged user wants to book a one-way flight from Cleveland

(CLE/Cleveland Hopkins International Airport) to Houston (IAH/George Bush Intercontinental Airport). As shown in the attached screenshots, Skiplagged has offered an itinerary that departs from Cleveland, connects through Houston, and then continues on to Phoenix (PHX/Phoenix Sky Harbor International Airport). (*See id.*) When the user selects "Book Now," the user is redirected directly to United's website, with an itinerary from Cleveland to Phoenix. (*Id.*) The transition from the Skiplagged site to United's website strongly suggests an affiliation or identity between Skiplagged and United that does not exist.

46. Zaman's false associations between Skiplagged and Orbitz, and between Skiplagged and United, have already caused confusion within the marketplace. For instance, at least one news outlet has reported on Skiplagged's redirection of users to Orbitz with pre-populated reservations, without any clarification that Orbitz has no business relationship with Skiplagged or that Skiplagged's actions are strictly prohibited by Orbitz and commercial airlines.

47. Zaman has also openly acknowledged that "hidden city" ticketing violates airline rules and regulations. For instance in a blog post he wrote in February 2014 to advertise his Skiplagged app, Zaman states that "hidden city" ticketing "[v]iolates some airlines['] [Terms of Service]."

48. Furthermore, upon information and belief, Zaman has personally profited from his practice of promoting "hidden city" ticketing by soliciting and receiving payments from commercial airlines and online travel agencies. In fact, in response to one of United's cease-and-desist letters, Zaman solicited United to become one of Skiplagged's "partners," and, in later communications with United, he represented that other airlines had agreed to partner with him. Furthermore, the Skiplagged site includes links to two meta search engines – Kayak and Hipmunk – which, upon information and belief, compensate Zaman for advertising their sites.

Likewise, at certain times, the Skiplagged website will "pop up" what appear to be paid advertisements for other services and products.

**IV.    Plaintiffs' Demands to Cease & Desist and Zaman's Refusals**

49.    Plaintiffs have each demanded that Zaman cease and desist his tortious acts. Although Zaman has replied with empty promises to stop, he has simultaneously taken affirmative steps to do just the opposite (while disguising the conduct), all in an effort to denigrate Plaintiffs' brands and hinder Plaintiffs' ability to identify and combat his conduct.

50.    On September 15, 2014, Orbitz Worldwide sent a cease-and-desist letter to Zaman, explaining that it has received several complaints from major airlines that believe Orbitz Worldwide is facilitating "hidden city" ticketing.    Orbitz Worldwide demanded that Zaman immediately cease and desist all redirection from Skiplagged to the Orbitz.com website, or to any of Orbitz's affiliate sites.

51.    On the same day, Zaman responded to Orbitz Worldwide by email and promised to "stop redirecting users to Orbitz and partners by end of business week."

52.    Zaman, however, did not stop redirecting Skiplagged users to Orbitz, but instead has blocked Orbitz IP addresses from accessing the Skiplagged website.    Starting on or around October 2, 2014, when Orbitz personnel attempted to perform a search on Skiplagged, they received an error message that read "Sorry for the inconvenience, but Skiplagged is unable to process your booking request."    Zaman, in other words, was trying to hide his improper conduct from Orbitz, so that he could go on redirecting Skiplagged users to Orbitz's site, without Orbitz's permission or knowledge.    Orbitz believed and relied upon Zaman's promises and believed for a time that Zaman was complying with his promises based on several tests from Orbitz computers

that seemed to show that Zaman had complied with his promises. As such, Orbitz initially refrained from bringing this lawsuit.





(For a larger copy, *see id.*)

53.     Similarly, United sent a cease-and-desist letter to Skiplagged on September 5, 2014, demanding that Skiplagged refrain from offering "hidden city" ticketing of United flights. The letter explained that "hidden city" ticketing is expressly prohibited by Section 6(J) of United's Contract of Carriage.

54.     Zaman responded on September 5, 2014, with an extensive email outlining his disagreements with the cease-and-desist letter. Nevertheless, Zaman ended the letter with an offer to remove all references to "United Airlines" and United's logo on Skiplagged.

55.     Zaman and United's counsel and business representatives spoke via telephone on September 9, 2014, during which Zaman agreed to remove all United references and all United flights and fare information from Skiplagged's search results.

56.     Afterward, and contrary to his promises, Zaman merely "censored" the references to United on Skiplagged and added a notification for Skiplagged users that read "Sorry for the inconvenience, but United Airlines says we can't show you this information."



(For a larger copy, *see id.*)

57.     After further conversations, Zaman later emailed United on September 15, 2014, to confirm (purportedly) that "United is removed from our services.   Sorry for the inconvenience."

58.     Again, however, Zaman did not remove United content as promised.  To this day, he continues to include United flights and fare information in Skiplagged's search results, with a redaction of United's name and insertion of the word "censored."  Zaman also alters slightly the departure and arrival times of the United flights to create an argument that the information is not "identical."   More games and disguised false promises.   But this "censored" data is easily attributable to United because Zaman continues to allow consumers to select "Book Now!" for

United flights, at which point they are redirected to a United itinerary on either Orbitz's site, on United's site, or on a third-party booking site, depending on Skiplagged's redirection configuration (although, with further intent to create the impression of compliance, Zaman for a while disabled the "Book Now" button for United flights on the desktop version of Skiplagged – but not on the mobile version of Skiplagged – only to reactivate it after not hearing from United for a week or so). This false association between Skiplagged and United is intended to confuse consumers and give the impression that United condones or authorizes the practice of "hidden city" ticketing.

## V. Plaintiffs' Trademark Ownership

### A. *The Orbitz Marks*

59. Since long before the acts of Zaman complained of herein, Orbitz has been engaged in the business, *inter alia*, of the sales and marketing of travel agency services, namely, the making of reservations and bookings for transportation and temporary lodging (the **"Orbitz Services"**).

60. Since at least the early 2000s, Orbitz has provided its Orbitz Services to the public under the Orbitz name and one or more trademarks comprising the word "Orbitz," including, but not limited to, the marks identified in Paragraph 65 below (collectively, the "**Orbitz Marks**").

61. Orbitz displays and uses the Orbitz Marks in advertising and promotional materials for its Orbitz Services in interstate commerce, including without limitation, on television, radio commercials, the Internet, and in print and online advertisements. Further, Orbitz, LLC is the owner and operator of several websites, including that available at the URL http://www.orbitz.com, which are used to advertise and promote its Orbitz Services.

62. Long before the acts of Zaman, the Orbitz Marks became extremely well known among consumers throughout the United States.

63. Orbitz has spent millions of dollars annually to advertise and promote the Orbitz Services under the Orbitz Marks and has generated millions of dollars in annual sales by providing the Orbitz Services under the Orbitz Marks.

64. As a result of Orbitz's extensive use, advertising, and promotion of the Orbitz Marks, the Orbitz Marks have become famous and have acquired strong secondary meaning identifying Orbitz as the source of the Orbitz Services offered.

65. Orbitz, LLC has obtained a number of trademark registrations for its marks in the United States Patent and Trademark Office (copies of the registration certificate for each of the marks detailed below are attached hereto as composite Ex. H). Such registrations include, but are not limited to, the following:

| **MARK** | **REG. NO.** | **REG. DATE** | **GOODS OR SERVICES** |
|:---:|:---:|:---:|:---:|
| ORBITZ | 2,858,685 | June 29, 2004 | Providing on-line chat rooms and on-line bulletin boards for transmission of messages among computer users concerning travel; providing access to an interactive computer database in the field of travel information, transportation by air, train, bus or boat, musical events, theatrical events, live dramatic events, films, sporting events, dining, art exhibitions, ground traffic, parking, shopping and destination information; travel agency services, namely, making reservations and bookings for transportation; providing |

| | | | information concerning travel, travel news and travel-related topics via electronic communications networks; travel agency services, namely, making reservations and booking for temporary lodging. |
|---|---|---|---|
| ORBITZ.COM | 2,951,983 | May 17, 2005 | Providing on-line chat rooms and on-line bulletin boards for transmission of messages among computer users concerning travel; providing access to an interactive computer database in the field of travel information, transportation by air, train, bus or boat, musical events, theatrical events, live dramatic events, films, sporting events, dining, art exhibitions, ground traffic, parking, shopping and destination information; travel agency services, namely, making reservations and bookings for transportation; providing information concerning travel, travel news and travel-related topics via electronic communications networks; travel agency services, namely, making reservations and booking for temporary lodging. |

66.     Orbitz, LLC's trademark registrations under numbers 2,858,685 (ORBITZ) and 2,951,983 (ORBITZ.COM) are now incontestable in accordance with 15 U.S.C. §§ 1065 and 1115(b).   As such, those registrations serve as conclusive evidence of the validity of the incontestable Orbitz Marks and of the registration of these Orbitz Marks, of Orbitz, LLC's

ownership of these Orbitz Marks, and of Orbitz's exclusive rights to use the incontestable Orbitz Marks in U.S. commerce.

67.     As a result of the extensive use and promotion by Orbitz of the Orbitz Marks, Orbitz now owns valuable goodwill, which is symbolized by said name and marks.  The use of the Orbitz Marks substantially increases the value of Orbitz's business and the salability of its Orbitz Services.

68.     Long after the Orbitz Marks became incontestable, Zaman began using the Orbitz Marks by providing a service to Skiplagged users in interstate commerce and by re-directing those users to Orbitz's website.  As explained above, the transition from the Skiplagged site to Orbitz's website strongly suggests an affiliation or identity between Skiplagged and Orbitz that does not exist.  Zaman is attempting to confuse and mislead the public into believing that his website, and the "hidden city" ticketing it employs, is done with the approval (if not the outright authorization and sponsorship) of Orbitz and the airlines.

69.     In accordance with 15 U.S.C. § 1072, Orbitz, LLC's federal trademark registrations, including the Orbitz Marks identified above, served as constructive notice to Zaman of Orbitz's rights in and to the Orbitz Marks.  Moreover, as a result of Zaman's participation in the Orbitz affiliate program, Zaman had actual notice of Orbitz's rights in and to the Orbitz Marks.

70.     Despite this notice, Zaman has deliberately and willfully associated the Skiplagged website with Orbitz, without Orbitz's consent or authority.  Zaman's actions have and are likely to continue to cause confusion, cause mistake, and deceive consumers.

    B.    *The United Marks*

71.     Since long before the acts of Zaman complained of herein, United has been engaged in the business, *inter alia*, of the sales and marketing of air transportation of persons and property (the **"United Services"**).

72.     Since at least the late 1920s, United has provided its United Services to the public under the United name and one or more trademarks comprising the word "United," including, but not limited to, the marks identified in Paragraph 77 below (collectively, the "**United Marks**").

73.     United displays and uses the United Marks in advertising and promotional materials for its United Services in interstate commerce, including without limitation, on television, radio commercials, the Internet, and in print and online advertisements.  Further, United is the owner and operator of several websites, including that available at the URL http://www.united.com, which are used to advertise and promote its United Services.

74.     Long before the acts of Zaman, the United Marks became extremely well known among consumers throughout the United States.

75.     United has spent millions of dollars annually to advertise and promote the United Services under the United Marks and has generated millions of dollars in annual sales by providing the United Services under the United Marks.

76.     As a result of United's extensive use, advertising, and promotion of the United Marks, the United Marks have become famous and have acquired strong secondary meaning identifying United as the source of the United Services offered.

77.     United has obtained a number of trademark registrations for its marks in the United States Patent and Trademark Office (copies of the registration certificate for each of the

marks detailed below are attached hereto as composite Ex. I).  Such registrations include, but are not limited to, the following:

| MARK | REG. NO. | REG. DATE | GOODS OR SERVICES |
|---|---|---|---|
| UNITED | 676,462 | March 31, 1959 | Transportation of persons, mail, and property by air. |
| UNITED AIRLINES | 1,750,451 | February 2, 1993 | Transportation of persons, property and mail by air. |
|  | 2,022,051 | December 10, 1996 | Air transportation of persons and property. |

78.     United's trademark registrations under numbers 676,462 (UNITED), 1,750,451 (UNITED AIRLINES), and 2,022,051 () are now incontestable in accordance with 15 U.S.C. §§ 1065 and 1115(b).  As such, those registrations serve as conclusive evidence of the validity of the incontestable United Marks and of the registration of these United Marks, of United's ownership of these United Marks, and of United's exclusive rights to use the incontestable United Marks in U.S. commerce.

79.     As a result of the extensive use and promotion by United of the United Marks, United now owns valuable goodwill, which is symbolized by said name and marks.  The use of the United Marks substantially increases the value of United's business and the salability of its United Services.

80.     Long after the United Marks became incontestable, Zaman began using the United Marks by providing a service to Skiplagged users in interstate commerce, by using the United Marks in connection with that service, and by misleading Skiplagged users to believe that United condones the practice of "hidden city" ticketing.  As explained above, Zaman is attempting to confuse and mislead the public into believing that his website, and the "hidden

city" ticketing it employs, is done with the approval (if not the outright authorization and sponsorship) of United.

81.     In accordance with 15 U.S.C. § 1072, United's federal trademark registrations, including the United Marks identified above, served as constructive notice to Zaman of United's rights in and to the United Marks.   Moreover, as a result of Zaman's correspondence with United, and likely earlier, Zaman had actual notice of United's rights in and to the United Marks.

82.     Despite this notice, Zaman has deliberately and willfully associated the Skiplagged website with United and given off the impression that United condones the practice of "hidden city" ticketing, all without United's consent or authority.   Zaman's actions have and are likely to continue to cause confusion, cause mistake, and deceive consumers.

## COUNT I – LANHAM ACT – FEDERAL UNFAIR COMPETITION
### (under 15 U.S.C. § 1125(a), by Plaintiff Orbitz, LLC)

83.     Orbitz, LLC repeats and realleges each and every allegation in Paragraphs 1 through 82 as though fully set forth herein.

84.     Zaman's willful acts of associating the Skiplagged website with Orbitz has and is likely to continue to cause confusion, cause mistake, and deceive consumers.   Zaman's conduct in this regard constitutes a false designation of origin and a false representation of fact in connection with goods and services, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

85.     Orbitz, LLC has been damaged by Zaman's conduct and is likely to be damaged in the future.

86.     Zaman's conduct has also caused irreparable injury to Orbitz, LLC's goodwill and reputation, an injury which is and continues to be ongoing and irreparable.   Orbitz, LLC lacks an

adequate remedy at law, and an award of monetary damages alone cannot fully compensate Orbitz, LLC for its injuries. Accordingly, Orbitz, LLC is entitled to an injunction.

87. Furthermore, given Zaman's willful infringement and deceptive tactics, this is an exceptional case, and Orbitz, LLC is entitled to treble damages and reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a)(3).

WHEREFORE, Plaintiff Orbitz, LLC prays that the Court enter judgment in its favor and against Defendant Zaman, and award Orbitz, LLC the following relief: (i) preliminarily enjoin Zaman from falsely associating Skiplagged's services with Orbitz; (ii) permanently enjoin Zaman from falsely associating Skiplagged's services with Orbitz; (iii) award treble damages in Orbitz, LLC's favor and against Zaman in excess of $75,000; (iv) order disgorgement of Zaman's profits, and award such profits to Orbitz, LLC; (v) award Orbitz, LLC its costs and reasonable attorneys' fees; and (vi) grant such other or further relief as the Court deems just and equitable.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT
### (by Plaintiff Orbitz Worldwide)

88. Orbitz Worldwide repeats and realleges each and every allegation in Paragraphs 1 through 87 as though fully set forth herein.

89. Orbitz Worldwide's travel agency agreements with commercial airlines are valid and enforceable contracts. Orbitz Worldwide has fulfilled all of its contractual obligations under these agreements.

90. Zaman had knowledge of Orbitz Worldwide's travel agency agreements with commercial airlines, including the restrictions that American Airlines, British Airways, Iberia Airlines, and Delta Airlines impose on their travel agents.

91.     Zaman has intentionally interfered with Orbitz Worldwide's travel agency agreements with commercial airlines.  He continues to do so, while still trying to shield his conduct by blocking Orbitz personnel.

92.     Zaman's intentional interference is without justification.

93.     Zaman's conduct has jeopardized Orbitz Worldwide's ability to perform the travel agency agreements with commercial airlines, including but not limited to, the prohibitions in Section 3(c) of the American Agency Addendum between American Airlines and its travel agents, and the prohibitions in Section 3(c) of British Airways' and Iberia Airlines' agreements with their travel agents.

94.     As a result of Zaman's conduct, Orbitz Worldwide has suffered and will continue to suffer damage, including but not limited to remedies available to commercial airlines in the agency agreements and the costs of investigating Zaman's wrongful conduct.

95.     Zaman's conduct has also caused irreparable injury to Orbitz Worldwide's goodwill and reputation, an injury which is and continues to be ongoing and irreparable.  Orbitz Worldwide lacks an adequate remedy at law, and an award of monetary damages alone cannot fully compensate Orbitz Worldwide for its injuries.  Accordingly, Orbitz Worldwide is entitled to a permanent injunction.

96.     Furthermore, because Zaman has continued to operate his website in a way that damages Orbitz Worldwide, despite his promises that he would cease and desist all such activity (and attempts to hide same from Orbitz), his conduct constitutes wanton and malicious behavior warranting punitive damages.

WHEREFORE, Plaintiff Orbitz Worldwide prays that the Court enter judgment in its favor and against Defendant Zaman, and award Orbitz Worldwide the following relief:  (i)

preliminarily enjoin Zaman from tortiously interfering with Orbitz Worldwide's contracts; (ii) permanently enjoin Zaman from tortiously interfering with Orbitz Worldwide's contracts; (iii) award damages in Orbitz Worldwide's favor and against Zaman in excess of $75,000; (iv) award punitive damages in Orbitz Worldwide's favor and against Zaman because of Zaman's wanton and malicious conduct; (v) award Orbitz Worldwide its costs; and (vi) grant such other or further relief as the Court deems just and equitable.

## COUNT III – BREACH OF CONTRACT
## (by Plaintiff Orbitz, LLC)

97.     Orbitz, LLC repeats and realleges each and every allegation in Paragraphs 1 through 96 as though fully set forth herein.

98.     Orbitz, LLC's Affiliate Agreement with Zaman, including the Terms and Conditions that are incorporated, constitutes a valid and enforceable contract.

99.     Zaman has and continues to breach the Affiliate Agreement and its incorporated Terms and Conditions.  Specifically, Zaman has and continues to breach the Affiliate Agreement by using the Skiplagged website in a way that makes Skiplagged's services and marks confusingly similar to the Orbitz Services and the Orbitz Marks.  In addition, Zaman has and continues to breach Section 3 of the Terms and Conditions by, *inter alia*, implying that Orbitz is endorsing Skiplagged's products and services; using Orbitz's website for illegitimate reservations and bookings; using software to interfere, or attempt to interfere, with the normal operation of Orbitz's website; and disguising the origin of information transmitted through Orbitz's website – all without Orbitz, LLC's prior written consent.

100.     Orbitz, LLC has performed all of its obligations under the Affiliate Agreement.

101.    As a result of Zaman's continuing breaches, Orbitz, LLC has suffered and will continue to suffer damage, including but not limited to irreparable harm to Orbitz, LLC's client relationships and reputation.

WHEREFORE, Plaintiff Orbitz, LLC prays that the Court enter judgment in its favor and against Defendant Zaman, and award Orbitz, LLC the following relief: (i) preliminarily enjoin Zaman from breaching the Affiliate Agreement between him and Orbitz, LLC; (ii) permanently enjoin Zaman from breaching the Affiliate Agreement between him and Orbitz, LLC; (iii) award damages in Orbitz, LLC's favor and against Zaman in excess of $75,000; (iv) award Orbitz, LLC its costs; and (vi) grant such other or further relief as the Court deems just and equitable.

## COUNT IV – LANHAM ACT – FEDERAL UNFAIR COMPETITION
### (under 15 U.S.C. § 1125(a), by Plaintiff United)

102.    United repeats and realleges each and every allegation in Paragraphs 1 through 101 as though fully set forth herein.

103.    Zaman's willful acts of associating the Skiplagged website with United has caused, and is likely to continue to cause, confusion and cause mistake and deceive consumers. Zaman's conduct in this regard constitutes a false designation of origin and a false representation of fact in connection with goods and services, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

104.    United has been damaged by Zaman's conduct and is likely to be damaged in the future.

105.    Zaman's conduct has also caused irreparable injury to United's goodwill and reputation, an injury which is and continues to be ongoing and irreparable. United lacks an adequate remedy at law, and an award of monetary damages alone cannot fully compensate United for its injuries. Accordingly, United is entitled to an injunction.

106.    Furthermore, because Zaman's conduct has been willful and deceptive, this is an exceptional case, and United is entitled to treble damages and reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a)(3).

WHEREFORE, Plaintiff United prays that the Court enter judgment in its favor and against Defendant Zaman, and award United the following relief:  (i) preliminarily enjoin Zaman from falsely associating Skiplagged's services with United; (ii) permanently enjoin Zaman from falsely associating Skiplagged's services with United; (iii) award treble damages in United's favor and against Zaman in excess of $75,000; (iv) order disgorgement of Zaman's profits, and award such profits to United; (v) award United its costs and reasonable attorneys' fees; and (vi) grant such other or further relief as the Court deems just and equitable.

### COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT
### (by Plaintiff United)

107.    United repeats and realleges each and every allegation in Paragraphs 1 through 106 as though fully set forth herein.

108.    United's Contract of Carriage is a valid and enforceable contract.  United has fulfilled all of its contractual obligations in the Contracts of Carriage with its customers.

109.    Zaman had knowledge of United's Contract of Carriage, including Section 6(J)'s prohibitions relating to "hidden city" ticketing.

110.    Zaman intentionally interfered with United's Contracts of Carriage with its customers by inducing customers to engage in "hidden city" ticketing, which is expressly prohibited in Section 6(J) of the Contract of Carriage.

111.    Zaman's intentional interference was done without justification.

112.    Zaman's conduct of encouraging "hidden city" ticketing has induced United customers to breach their Contracts of Carriage upon purchase of their "hidden city" flights through Orbitz.

113.    As a result of these breaches, United has suffered and will continue to suffer damage, including but not limited to increased operating costs due to scheduling disruptions; loss of revenues from prospective United customers who would have otherwise purchased seats on the "skipped" legs of passengers' flights; and the costs of investigating Zaman's wrongful conduct.

114.    Zaman's conduct has also caused irreparable injury to United's goodwill and reputation and in increased risk of harm to public safety, injuries which are and continue to be ongoing and irreparable.  United lacks an adequate remedy at law, and an award of monetary damages alone cannot fully compensate United for its injuries.  Accordingly, United is entitled to an injunction.

115.    Furthermore, because Zaman has continued to operate his website in a way that damages United, despite his promises that he would cease and desist all such activity (and ongoing attempts to hide same), his conduct constitutes wanton and malicious behavior warranting punitive damages.

WHEREFORE, Plaintiff United prays that the Court enter judgment in its favor and against Defendant Zaman, and award United the following relief:  (i) preliminarily enjoin Zaman from tortiously interfering with United's contracts; (ii) permanently enjoin Zaman from tortiously interfering with United's contracts; (iii) award damages in United's favor and against Zaman in excess of $75,000; (iv) award punitive damages in United's favor and against Zaman

because of Zaman's wanton and malicious conduct; (v) award United its costs; and (vi) grant such other or further relief as the Court deems just and equitable.

## COUNT VI – MISAPPROPRIATION
### (by Plaintiff United)

116.    United repeats and realleges each and every allegation in Paragraphs 1 through 115 as though fully set forth herein.

117.    United expends significant time, labor, and financial resources on developing its fare calculations and flight schedules, and in protecting this content from its competitors. United strives to ensure that this data cannot be easily duplicated without United's prior consent.

118.    United's fare and scheduling data reflect not only the price of travel, but also the ever-changing level of availability on a particular flight. Thus, United's fares are highly time-sensitive.

119.    United's fare and scheduling data have substantial commercial value, particularly among United's competitors. Zaman's use of United's fare and scheduling data on the Skiplagged website constitutes free-riding on United's labor, efforts, and resources. This wrongful act of free-riding advantages Zaman because he, upon information and belief, is personally profiting from the use of this information. Zaman's acts also disadvantage legitimate attempts by United and its authorized agents to use the fare and scheduling data. Because of these disadvantages, Zaman's free-riding discourages future investments in new fare and scheduling models.

120.    As a result, United has suffered and will continue to suffer damage to its fare and scheduling processes.

121.    Furthermore, because Zaman has continued to operate his website in a way that damages United, despite his promises that he would cease and desist all such activity, his conduct constitutes wanton and malicious behavior warranting punitive damages.

WHEREFORE, Plaintiff United prays that the Court enter judgment in its favor and against Defendant Zaman, and award United the following relief:  (i) preliminarily enjoin Zaman from misappropriating United's fare and scheduling data; (ii) permanently enjoin Zaman from misappropriating United's fare and scheduling data; (iii) award damages in United's favor and against Zaman in excess of $75,000; (iv) award punitive damages in United's favor and against Zaman because of Zaman's wanton and malicious conduct; (v) award United its costs; and (vi) grant such other or further relief as the Court deems just and equitable.

Date:  November 17, 2014

Respectfully submitted,

**UNITED AIRLINES, INC.,**
**ORBITZ WORLDWIDE, LLC &**
**ORBITZ, LLC**


/s/ *John S. Letchinger*
*One of the Attorneys for Plaintiffs*

John Letchinger (#6207361)
Matthew Caccamo (#6282605)
Frank Blechschmidt (#6308606)
BAKER & HOSTETLER LLP
191 N. Wacker Drive, Suite 3100
Chicago, Illinois 60606
(312) 416-6200
(312) 416-6201 (FAX)

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that a copy of the foregoing **Plaintiff's Complaint** will be served upon the following, or an agent thereof, via personal delivery by an individual over the age of 18 who is not a party to this action, and that a notice certifying the same will be filed upon service.

Aktarer Zaman
8312 101st Ave. Fl. 3
Ozone Park, New York 11416-2011

/s/ *John S. Letchinger*
John S. Letchinger