# EXHIBIT B



Plan Travel    Travel Information    Login    English    AAdvantage Login    Search aa.com



### American Airlines, Inc., Addendum to the Governing Travel Agency Agreements

#### American Airlines, Inc., Addendum to the Governing Travel Agency Agreements

Your travel agency, including affiliated agency locations under common control that are accredited by Airlines Reporting Corporation ("ARC") or the International Air Transport Association ("IATA") (collectively "Agent"), has entered into the Agent Reporting Agreement (the "ARC Agreement") with ARC with respect to travel agency location(s) in the United States and the IATA Passenger Sales Agency Agreement (the "IATA PSAA") with respect to any travel agency locations outside the United States (collectively "Governing Travel Agency Agreements"). The terms and conditions governing the agent-principal relationship between Agent and American Airlines, Inc., including all affiliated airlines under common control of the American Airlines Group, Inc., such as US Airways, Inc., (collectively "American") are set forth below and in the Governing Travel Agency Agreement applicable to each travel agency location which is incorporated by reference (all texts being referred to collectively as this "Agreement"). The terms and conditions below will prevail in the event of any conflict between those terms and conditions and the applicable Governing Travel Agency Agreement. American has appointed Agent to act as an agent for American in the sale of American's products and services ("Agent's Appointment" or "Appointment"). Agent acknowledges and affirms that it is an agent of American, and effective as of June 12, 2014, Agent's continued sale of American's products and services will evidence our mutual agreement to the terms and conditions of this Agreement. To the extent that Agent engages employee, sub-agents, services vendors or other third party contractors to support Agent's activities within the scope of the Appointment, Agent will be responsible to American for their full compliance with this Agreement. The terms and conditions of this Agreement apply to any tickets issued using American's ticket stock.

**American Airlines Agency Reference**

- **Home**
- **Agency - Advanced Search**
- **American Airlines, Inc., Addendum to Governing Travel Agency Agreements (GTAA)**
- **Archive News**
- **Baggage**
- **Booking and Ticketing**
- **Business Extra - Agency Instructions**
- **Choice Fare Options - FAQ**
- **Debit Memos**
- **General Information**
- **Name Change or Name Correction Restrictions**
- **Partners**
- **Programs**
- **Refunds**
- **Seating Options**
- **Secure Flight -FAQ**
- **Schedule Change - Rule 240/80 - Schedule Irregularity**
- **Suspension Of Service Releases**
- **Travel Experience**
- **Travel Notice Exception Policy Releases**
- **TSA Trusted Traveler Program - FAQ**
- **All Topics**

**1. Appointment.**

American may independently review any of Agent's locations, including those under Agency's common control, that are accredited by ARC or IATA (the "Agency Locations"). The review may include on-site inspection of any Agency Location to determine that Agent's operations comply with American's requirements for its agents in the sale of American products and services. Without limitation, and in its sole discretion and at any time, American may, upon written notice to Agent, suspend or limit Agency's Appointment, including immediately terminating American's appointment of any Agency Location or Agent's Appointment. If any Agency Location is terminated, Agent may not act in any agency capacity for the sale of American's products and services from the terminated location. If Agent's Appointment is terminated, Agent may not act in any agency capacity whatsoever for the sale of American's products and services.

**2. Commissions.**

(a) **Right to Modify Commission Policy.** American does not currently pay base commissions to ARC-accredited agents for the sale of American's products and services. American, in its sole discretion, reserves the right to modify its commissions and other compensation policies for Agents at any time.

(b) **Limitations on Any Commissions.** If American chooses to pay any commissions for the sale of American's products and services, American will pay commissions to Agent only in accordance with its then-current policy and only for Agent's issuance of standard tickets that show American as the ticketing carrier and that are properly issued in accordance with this Agreement. Agent is not entitled to any commission for (1) tickets for which a full or partial refund is made, (2) late or unreported tickets, or (3) tickets issued to owners, officers, directors, stockholders, members, partners, or employees of either Agent or any person or entity which controls, is controlled by, or is under common control with Agent. Any commissions are based on the fare paid only; American does not pay any commissions on governmental or similar taxes, fees, and charges, or fees or charges collected by Agent for its own account or for the account of a third party.

**3. Compliance with American's Rules and Rates.**

(a) **General.** Agent will strictly adhere to American's current instructions, rules, regulations, requirements, conditions of sale or carriage, tariffs, and procedures (the "Rules") in booking any reservation or issuing, reissuing, selling, exchanging, refunding, canceling or reporting any ticket calling for transportation on American. Agent will also comply with all laws and regulations applicable to its activities under this Agreement. Failure to comply may subject Agent to debit memos from American for any deficiency or any loss incurred by American by reason of the violation and the suspension, limitation or termination of Agent's appointment.

(b) **AAdvantage®/Promotional Programs.** Agent agrees to comply with all Rules governing the AAdvantage® Program and other promotional programs, including the issuance of promotional certificates and tickets. Agent acknowledges that the purchase, sale, or barter of promotional or AAdvantage® awards, mileage, or tickets (other than a purchase from American) is strictly prohibited and any Agent's direct or indirect involvement in any of these activities subjects Agent to (i) debit memos, (ii) the suspension, limitation or termination of Agent's Appointment, and (iii) legal or equitable remedies. Agent further acknowledges and understands that any fraud or abuse concerning promotional programs or AAdvantage® awards, mileage, or tickets on the part of Agent or Agent's customers may subject Agent's customers to administrative and legal action by American, including the forfeiture of all (i) award certificates, (v) tickets issued against award certificates, and (vi) accrued mileage in the member's account, as well as suspension or cancellation of the account. Agent further understands that promotional or AAdvantage® award tickets that have been purchased, sold, or bartered are void and that use of these tickets may result in the tickets being confiscated by American, the passenger's trip being stopped or interrupted, and the passenger being required to purchase a ticket to continue travel.

(c) **Prohibition of Abusive Booking Practices.** Agent acknowledges that Hidden City/Point Beyond Ticketing, Back to Back Ticketing, cross-border ticketing, Throwaway Ticketing, Duplicate and Impossible/Illogical Bookings and other Fraudulent, Fictitious, or Abusive Bookings, violate American's Rules. (See American's Conditions of Carriage for definitions of these types of Fraudulent, Fictitious and Abusive bookings.) It is the Agent's responsibility to ensure that ticketing or bookings done by Agent are not for Hidden City/Point Beyond Ticketing, Back to Back Ticketing, cross-border ticketing, Throwaway Ticketing, Duplicate and Impossible/Illogical Booking and other Fraudulent, Fictitious, or Abusive Booking purposes.

Circumventing journey controls to obtain sold out inventory is also prohibited. Furthermore, since American is not a participant in other carriers' private agreements and since American does not honor other airlines discount codes, Agent agrees that other airline private or contracted fares or ticket designators may not be ticketed using American's ticket stock.

Agent acknowledges that if it engages in these practices, or sells or issues a ticket used for any of these purposes, Agent will be subject to (1) debit memos, (2) the suspension, limitation or termination of Agent's Appointment, and (3) other remedies available to American.

(d) **Fraud and Misrepresentations.** Agent will not engage in any fraudulent activity, including altering flight coupons for non-qualifying discount travel, backdating tickets, or selling no-cash-value coupons, discounts, or upgrades. Fraudulent activity also includes intentionally withholding or misrepresenting information regarding American products and services, such as information regarding availability and pricing.

(e) **Regulatory Compliance.** All advertising and promotions by Agent for American's products and services will fully comply with all applicable laws, rules and regulations as well as any guidelines from the Department of Transportation (DOT) and other government regulators. For example, all print advertising will prominently disclose any codeshare or long-term aircraft wet-lease arrangements involved in the markets being advertised and radio and television adverts will disclose the fact that some services may be provided by other airlines, as required by 14 CFR 257-5(d). In addition, Agent must comply with all rules and guidance from the DOT regarding advertising and promotions, including those pertaining to full fare advertising, price increases and ancillary services. Failure to comply subjects Agent to debit memos and the suspension, limitation or termination of the Agency Location or Agent's Appointment by American.

(f) **No Biasing or Alterations.** Agent will ensure that its systems, processes and sales practices accurately display and convey all information relating to American's products and services as presented by American. Agent's systems, processes and practices may automate a customer's preferences for air carrier, but must not otherwise involve any form of bias against American's products and services, or alter the presentation of the information as provided by American. Agent must not facilitate or encourage such biasing or alterations by others. Additionally, Agent will not impose service fees, discounts, or other fees (including, without limitation, ticketing fees or charges, paper ticket fees or charges, delivery fees or charges, booking fees or charges, incentives or other features) with respect to the display, offer, booking, ticketing or sale of American's products and services that are higher than those imposed for the display, offer, booking, ticketing or sale of any other carrier products and services. If Agent charges a service or other fee for its services, such charge or fee shall be listed separately and the charge or fee for an American booking or other American product or service must be the equal to the lowest fee imposed by Agent on other air carriers.

(g) **No Re-Distribution.** Agent's Appointment is for purposes of the Agent marketing and selling American's products and services directly to customers for those products and

services. Agent's Appointment is specific to Agent, and does not include any authority for Agent to act as an intermediary for further distribution of American's products and services via other intermediaries and sales agents. For example, Agent may not offer or distribute American products and services as part of a service provided by Agent that is re-branded so that it appears to customers to be a search, booking or ticketing service from a third party. Any such re-distribution arrangement is only permitted pursuant to a separate agreement signed by authorized representatives of both Agent and American. In addition, if Agent uses or works with a non-accredited entity in making a booking, then Agent acknowledges and agrees that American reserves the right to reject the booking in American's sole discretion and that Agent nonetheless remains fully responsible to American in all respects for any bookings made by third parties and ticketed via Agent's Appointment.

(h) **PNR Content**. Complete information in a reservation is important to appropriately service customers during the course of travel *and required for governmental compliance programs such as Secure Flight*, therefore Agent must provide American with all the contact information offered by customers including but not limited to phone fields and emails as well as any other information required by governmental authorities. Agent may not substitute any contact information or provide Agent's contact information in lieu of such customer information without the consent of American and the customer. American will treat all PNR content received in accordance with American's privacy policy.

(i) **Electronic Display**. Agent will not display American's products and services via electronic means directly to customers without American's prior written approval. However, any Agent with an incentive agreement in effect with American as of June 12, 2014 may continue any existing electronic display for the remainder of the then current term of the agreement, not including any future extensions of the term, but thereafter will need written approval from American.

(j) **Exceptions**. To be valid, any exceptions to American's Rules in the booking of any reservation or the issuance, reissuance, or refund of any ticket calling for transportation on American must be documented by American in the applicable PNR.

**4. Use of American's Identification Plate.**

American's validation plate is American's sole property, and Agent will surrender it immediately upon demand by American, ARC or IATA. Agent shall not issue electronic tickets or any other traffic documents for transportation on any airline that has refused to appoint, or has terminated its appointment of, Agent. Further, Agent will not issue tickets for transportation on American on behalf of any other travel agency location for which American has refused or terminated its appointment, including any of the Agency Locations. Agent will not use American's validation to issue tickets for transportation on carriers that do not maintain a ticketing and baggage interline agreement with American.

**5. Debit Memos.**

(a) **Issuance of Debit Memos**. If Agent issues a ticket in violation of this Agreement or is otherwise in violation of the Rules American has issued for travel agents, American may issue a debit memo to Agent for any deficiency or any loss incurred by American by reason of the violation, including, without limitation an amount equal to the cost of the ticket, the difference between the applicable fare and the fare actually used, CRS fees, lost revenue from spoiled inventory, or an administrative service charge, as American deems appropriate and may immediately suspend, limit or terminate the Agency Location or Agent's Appointment upon notice to Agent. Agent acknowledges that American's damages for Agent's failure to comply may be uncertain or difficult to ascertain or prove and that American's administrative service charges are a reasonable estimate of American's loss due to the Agent's improper acts in these situations. American also retains all rights and remedies available to it under this Agreement or at law or in equity.

(b) **Payment of Debit Memos**. Agent agrees to pay or reconcile all debit memos and debit memo fees issued by American within 30 days of the date of issuance. If Agent fails to do so, American reserves the right to assess, and Agent agrees to pay, interest on the past due amounts at a rate not to exceed one and one-half percent (1½%) per month, compounded monthly, or the maximum rate permitted by law, whichever is less, from the date due to the date of the payment.

(c) **Administrative Processing Fees**. American reserves the right to assess, and Agent agrees to pay, an administrative processing fee to be included as part of any debit memo issued to Agent. American also reserves the right to assess, and Agent agrees to pay, an additional administrative processing fee of at least $300.00 to cover administrative expenses in connection with an audit or review of a request by Agent for reinstatement of Agent's Appointment following the suspension, limitation or termination for any reason by American. American's acceptance of any administrative fees does not obligate American to act, or refrain from taking any action, nor does it waive, release, amend, or modify this Agreement, or any rights or obligations of Agent or American.

**6. Agency Free and Reduced Travel.**

Agent will comply with American's Rules concerning Agency free travel and reduced rate travel privileges. Failure to comply subjects Agent to debit memos and the suspension, limitation or termination of the Agency Location or Agent's Appointment.

**7. Agent Incentive, Promotional, and Override Programs.**

Agent will comply with American's Rules and any specific contractual requirements concerning agency incentives, promotions, or overrides with American in which Agent participates or has an interest. Failure to comply subjects Agent to (1) forfeiture and repayment to American of all sums paid by American to Agent or the value received by Agent, (2) the suspension, limitation or termination of Agent's right to participate in or receive all or a part of any agency incentives, promotions, or overrides, and (3) the suspension, limitation or termination of Agent's Appointment.

**8. Data Ownership and Use.**

(a) **Background**. The creation, development, collection, verification, formatting, organizing and maintenance of fares, schedule, inventory, merchandising and other pre-booking data about American's products, services and facilities requires extensive investment of time, money and specialized resources of American. For example, American expends significant amounts of time and money to (i) analyze markets and competition for air transportation and related products and services, (ii) analyze aircraft fleet types and utilization, (iii) analyze operating conditions at airports and air traffic control infrastructure, crew scheduling requirements and legal/regulatory requirements, and (iv) develop, deploy and use proprietary algorithms, processes and techniques, many of which have taken years to develop and are critical to American's competitiveness, and (v) train its personnel to become skilled and knowledgeable about each of the foregoing. This investment in pre-booking data also results in post-booking data about American's products and services and the customers who purchase and consume them, and therefore American's post-booking data is similarly valuable and competitively sensitive. The integrity, value and availability of American's pre- and posting booking data can only be preserved if it is accessed and used in ways that have been authorized by American. Unauthorized access can cause disruption and harm to American's systems, business and customers, and misuse of such data can lead to safety and security issues, as well as cause material commercial harm to American.

(b) **American Data**. Agent understands and agrees that as between American and Agent and as a consequence and condition of Agent's Appointment, any information or data, regardless of source, that (i) identifies American (e.g., American's trademarks), (ii) identifies or is reasonably identifiable to services or products provided by American, including all fare and inventory information, (iii) relates to a relationship between a customer and American (e.g., frequent flyer or club membership), (iv) relates to a transaction between a customer and American, including booking and payment data, or (v) is passed by Agent to American through a PNR or similar booking/sale record (collectively, "American Data"), is and will be owned by American. Access and use of American Data by the Agent is solely for purposes of and is limited to those activities that are within the scope of the principal-agent relationship as defined and authorized by American for all of Agent's Locations.

(c) **Examples of Unauthorized Activities.** Any use of American Data beyond what is permitted in Section 8(b) above is unauthorized. As guidance, American provides the following examples of specific types of access, use, distribution and remarketing of American Data that are prohibited without prior written consent from American: (1) accessing AA.com by the use of any automated or electronic devices commonly known in the Internet industry as robots or spiders, or by the use of other electronic search devices; (2) soliciting, facilitating, encouraging or agreeing to provide access to or otherwise remarket or redistribute, or take affirmative steps to allow or permit such access to, or remarketing or redistribution of, any American Data to any third party, through any process, including screen scraping, spiders, web "bots" or other device, software or system; (3) licensing, selling, or otherwise providing to any person or entity any software or other device that is capable of accessing American Data from any source; or (4) editing, modifying, creating derivatives, combinations or compilations of, combining, associating, synthesizing, reverse engineering, reproducing, displaying, distributing, disclosing, or otherwise processing American Data; (5) engaging in any kind of commercialization, marketing, advertising, licensing or resale that is based on American Data (e.g., advertising credit card offers to consumers based on the American Marks or flight information) except as otherwise permitted by this Agreement; (6) facilitating structured posting of American Data to any third party electronic media, including without limitation Facebook, Twitter, online calendars; (7) accessing American Data from any unauthorized source which American may identify to Agent; and (8) assisting, aiding, or abetting in any way the unauthorized access, use, distribution or display of American Data, including American Data obtained or derived from AA.com or any other web site or any other source, such as a Global Distribution System. Agent may not engage in any of the above examples, or any other unauthorized access, use, distribution or remarketing of American Data, without the prior written authorization of American. If Agent learns that any third party is accessing, distributing, remarketing or displaying American Data in any way obtained via Agent, including Agent's web site, without American's written authorization, Agent will promptly inform American and take all commercially reasonable measures, including commercial, technological, or legal measures, to prevent the unauthorized access, display, remarketing or distribution of American Data.

(d) **Other Data.** The intent of this Section 8 is to maintain and protect the proprietary, commercial, competitive and confidential integrity of American Data. American recognizes that travel agents have separate relationships with their own customers, whether individual persons or companies. In those separate relationships, travel agents may collect, have access to and rights to customer-identifying information: name, address, phone number(s), e-mail address(es) and IP address(es), as well as information specific solely to the travel agency and its products and services. In addition, American recognizes that customers have overlapping or separate rights and interests in data that is processed on their behalf by Agent as part of the Agent's marketing, sale or delivery of American's products and services by Agent to customers and nothing in this Section 8 is intended to restrict the processing of such data so long as Agent is acting in accordance and within the scope of its principal-agent relationship with American and with the terms of this Agreement.

**9. Confidentiality, Privacy and Data Security.**

(a) **Confidentiality.** Agent will keep confidential and not disclose to any third party the following confidential information of American: (i) any fare programs and commission arrangements that may be agreed with American; (ii) any and all post-booking data, including all PNRs, that cover American products and services; and (iii) any other American Data that American designates as confidential ("Confidential Information"). However, American consents to Agent disclosing commission arrangements and payments to customers when this information is requested by the customer. Agent may also disclose American confidential information to Agent's directors, officers, employees or agents to the extent such persons are bound by equivalent confidentiality commitments and have a legitimate need to know such information in order for the Agent to perform its obligations to American. In

addition, this Section will not prohibit Agent from making disclosures required by law or judicial process after making reasonable efforts to resist disclosure and notify American. Agent acknowledges that American may disclose fare program and commission arrangements to American's alliance carriers including oneworld Alliance carriers. This provision will survive the suspension, limitation or termination or expiration of Agent's Appointment.

(b) **Privacy.** American Data will be handled by American pursuant to and in accordance with American's privacy policy. In all other respects, American, as the owner of American Data, can use and disclose American Data for any purpose. Agent will not adopt, apply or publish any privacy policy inconsistent with the requirements of this Agreement or American's privacy policy.

(c) **Data Security.** Agent will establish, implement, maintain, and use technical and organizational safeguards against the unauthorized disclosure, access, use, destruction, loss, damage or alteration of American Data that is in the possession of Agent or its agents. Such safeguards will be in compliance with all applicable laws and regulations, including any privacy or data protection statutes in the United States, United Kingdom and European Union, and will be no less rigorous than (i) industry standard practices in the transportation and related services industry, and (ii) reasonable security procedures and practices appropriate to the nature of such American Data. For the avoidance of doubt, such data safeguards must include: (i) compliance with the current Payment Card Industry Data Security Standard, and VISA, MasterCard and any other applicable credit card network bylaws and operating regulations and federal and state laws or regulations relating to credit card processing; (ii) encryption of all records and files that contain any personal information when Agent transmits such records and files across public networks or any wireless network or stores such records and files on laptops, thumb drives or other portable devices or transfers such records and files for storage; and (iii) compliance with any security standards required by local law or regulations, including the laws and regulations of the Member State in which the Agent is located if the Agent is based in the European Union.

(d) **Remediation.** Following any Security Incident (defined as (i) the loss, misappropriation or misuse (by any means) of American's Confidential Information; (ii) the inadvertent, unauthorized, and/or unlawful processing, distribution, alteration, corruption, sale, rental, or destruction of American's Confidential Information; (iii) any other act or omission that compromises or threatens to compromise the security, confidentiality, or integrity of American's Confidential Information, or (iv) any breach of American's security policies set forth herein), Agent must notify American within 24 hours. Agent and American will work in good faith regarding remediation efforts that may be necessary and reasonable. At American's sole discretion, Agent shall (i) either undertake remediation efforts for a Security Incident at its sole expense and in line with Security Best Practices or reimburse American for American's reasonable costs and expenses in connection with taking remediation efforts for a Security Incident and (ii) provide assurances satisfactory to American that such Security Incidents will not recur.

**10. American's Intellectual Property.**

(a) **Background.** American's intellectual property, including its famous trademarks, logos, livery, travel posters, web sites and advertising, are important and valuable assets of American. Who uses them and how they are used has an impact on their continuing value and fame.

(b) **American Marks and Correct Use.** American grants Agent a limited, royalty free, non-transferable, non-exclusive permission to use certain American intellectual property, specifically the trademarks AMERICANAIRLINES, AA, AMERICAN EAGLE, AMERICANCONNECTION, AADVANTAGE, ADMIRALS CLUB and the American Airlines trade dress (the "American Marks") solely for the purpose of identifying Agent as an authorized agent of American. In using the American Marks, Agent agrees that American owns the American Marks, and that Agent will not harm the American Marks or American's ownership of the American Marks or in any way contest or deny the validity of, or the right or title of American in or to, the American Marks. Agent acknowledges and understands that it has no right or permission to use the American Marks for any purpose not expressly stated in these terms and conditions, and that any unauthorized use of the American Marks will constitute an infringement of American's rights. Agent understands that it has no right or permission pursuant to this Agreement to use any other intellectual property owned by American or its affiliated entities. Agent further agrees not to use any intellectual property confusingly similar to the American Marks. Agent agrees that it will comply with American's trademark usage guidelines found on brand.aa.com, or any replacement thereof, and will reproduce the design and appearance of the American Marks from reproduction art obtained from such web site. Agent further agrees that it will not purchase, use, or register any domain names or keywords or search terms that are identical or similar to, or contain (in whole or in part), any of the American Marks.

(c) **No Implied or Other Rights.** Agent understands that it has no rights in American's intellectual property, nor can continued use of any of American's intellectual property ever give Agent any rights in or to any of American's intellectual property. Agent acknowledges that a breach of this Section will cause American significant, irreparable injury and that American's legal remedies for a breach will be inadequate. Agent will obtain American's written authorization (e-mail will suffice) before any use of American's intellectual property.

**11. Limitation of Liability.** AGENCY SHALL BE LIABLE TO AMERICAN, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE, FOR ANY LOST PROFITS OR BUSINESS INTERRUPTION, OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF AGENCY HAS NOT BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LIABILITY.

**12. Right to Inspect and Audit.**

American has the right to enter any Agency Location upon reasonable advance notice to: (1) inspect Agent's books and records relating to sales of American's products and services and to ensure Agent's compliance with the provisions of this Agreement; and (2) audit Agent's books and records to detect or establish Agent's abuse of, or failure to comply with, any of American's Rules concerning sale of travel on American, Agency free and reduced rate travel, agency incentives, promotional or override programs, or Agent ticket fraud. Agent agrees that American may use information obtained from ARC or IATA to evaluate the credit-worthiness of Agent and Agent's employees and owners.

**13. Miscellaneous.**

(a) **Prior Agreements.** This Agreement supersedes any prior agreement or addenda between American and Agent.

(b) **Waiver.** Any waiver or modification of any of the terms of this Agreement must be in writing from American. American may amend or modify this Agreement at any time. Agent agrees that failure of or delay by American to require strict performance or to enforce any provision of this Agreement, or a previous waiver or forbearance by American, will in no way be construed as, or constitute, a continuing waiver by American of any Rule or any provision of this Agreement.

(c) **APPLICABLE LAW.** THE LAWS OF THE STATE OF TEXAS AND THE UNITED STATES OF AMERICA WILL GOVERN THE ENTIRE RELATIONSHIP BETWEEN AMERICAN AND AGENT INCLUDING ALL DISPUTES THAT MAY ARISE BETWEEN AMERICAN AND AGENT REGARDING THE FORMATION, INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT. AGENT HEREBY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS AND THE COURTS OF THE STATE OF TEXAS FOR ALL THESE DISPUTES AND WAIVES ANY CLAIM OF LACK OF JURISDICTION OR *FORUM NON CONVENIENS*.

Updated June 12, 2014

Information contained on this website is subject to change at any time without notice. American Airlines shall not be liable for any consequences resulting from your reliance on the information.

## More About American

- About Us
- Corporate Information
- Careers
- Investor Relations
- Corporate Responsibility
- Join Us In Causes That Matter
- Environmental Footprint
- Diversity & Inclusion
- Newsroom

## Products & Services

- Travel Insurance
- Email Subscriptions
- Enhance Your Travel
- Low Price Guarantee
- Group & Meeting Travel
- Business Programs
- Cargo
- American Airlines Credit Card
- Gift Cards

## Customer Service

- Contact American
- FAQs
- Refunds
- Agency Reference
- American Travel Centers
- Baggage & Optional Service Charges
- Customer Service Plan & Contingency Plan
- Privacy Policy (newly updated)
- Legal

Earn 50,000 bonus miles

buyAAmiles
Up to 28,000 bonus miles

AVIS Budget
Up to 35% savings plus earn AAdvantage Miles

- Airline Museum
- DealFinder
- RSS
- Five Star Service
- Timetables & Downloads
- Last Minute Packages
- Copyright
- Site Map
- Browser Compatibility

